Booth Brothers and Hurricane Isle Granite Company and Others, Respondents, *v.* Matthew Baird and Charles Hart, Appellants, Impleaded with Others.

*General usage — knowledge of it, is presumed — knowledge of local usage, not presumed — meaning of "superficial yard."*

When the usage in relation to matters embraced in a contract is reasonable, uniform and well settled, not in opposition to fixed rules of law, nor in contradiction of the express terms of the contract, and when the usage is so far established and known to the parties that it may be supposed that the contract was made in reference to it, it is deemed to form a part of the contract, and may be shown in order to enable the court to declare what the contract expressed to the parties.

There are usages, however, so restricted to locality, trade or business, that a party, ignorant of them, is not presumed to have contracted with reference to them. A local meaning of the phrase "superficial yard," contained in a contract, where such meaning is claimed to be other than its obvious one, must be clearly established.

Appeal by the defendants, Matthew Baird and another, from a judgment of the Supreme Court in favor of the plaintiffs, entered in the office of the clerk of the county of New York on the 3d day of April, 1894, upon the report of a referee.

This action was brought to recover of the defendants a balance claimed to be due under the following contract :

"New York, *March 19th*, 1889.

"Messrs. Matthew Baird, John G. Smith, William Kelly, Charles Hart :

"Gentlemen — We will furnish you ten millions granite paving blocks, 9 inch and upwards in length, three and one-half to four and seven-eighths inches wide, and from 7 to 8 inches deep, which shall be acceptable to the departments under which they are to be used, provided the specifications are the same as named by the said departments for the year 1888, during the season ending December 31st, 1889. The blocks to be used in the cities of New York and Brooklyn, and to be delivered on such docks in said cities as you may designate, in equal monthly installments, as near as may be, subject to delays in transportation and obtaining transportation, occasioned by the dangers of the sea and the acts of God, for the following sums :

"For all blocks used by you in the city of New York, one dollar sixty-seven and one-half cents ($1.67½) per superficial yard.

" For all blocks used by you in the city of Brooklyn, one dollar and sixty-five cents ($1.65) per superficial yard.

" For all blocks sold by you to be used on contracts other than your own, seventy-nine dollars ($79) per M., to average 21 blocks to the superficial yard, said blocks to be paid as follows :

" Twenty dollars per thousand on the Wednesday following the delivery of each thousand. Forty dollars per thousand on the 10th of each month for all blocks delivered the preceding month, and the balance on all blocks laid by you, the time of the completion and acceptance of the contract in which said blocks are used, and the balance of all blocks sold by you as aforesaid thirty days after delivery of same.

" You to provide good and suitable. docks for each vessel forty-eight hours after notice of her readiness to deliver blocks under this arrangement, and to receive said blocks at the rate of not less than one hundred tons per day, Sundays, holidays and rainy days excepted.

" In the event that both of the cities of New York and Brooklyn do not make contracts requiring the use of ten millions of blocks, then the number of blocks to be taken by you under this arrangement shall be equal only to the number required under the said contract made by the said cities.

" We will also carry for you at our quarries a number of blocks, not exceeding three millions, during the time covered by this arrangement upon your payment to us on account thereof $40.00 per thousand for so many as shall be thus carried.

" Your early reply to this is waited.

" Very respectfully yours,

" BOOTH BROS. & HURRICANE ISLE GRANITE CO.
          " JOHN BOOTH, *Treasurer.*
" NEW YORK, ME. GRANITE P. BLOCK CO.
          " By JOHN PIERCE, *President.*
" ROCKPORT GRANITE CO.
          " By CHAS. S. ROGERS, *Treas.*
" Accepted : MATTHEW BAIRD,
          JOHN G. SMITH,
          WILLIAM KELLY,
          CHARLES HART.
" Witness :
          " CHARLES S. FERGUSON."

The plaintiffs recovered a judgment for $42,641, besides costs.

The recovery is on the basis of the engineer's measurements in Brooklyn, which includes the space occupied by railroad tracks and manholes, where necessarily there was no granite.

The importance of this item is suggested by the testimony of Mr. Dwyer, an engineer, who says that on the work done by the defendant Hart, the basis of computing the number of yards adopted by the referee, gives to the plaintiffs 6,253 square yards where no granite blocks were in fact laid, which at $1.65 per yard amounts to $10,317.15.

The recovery includes a large amount for granite where none was in fact laid by each of the other defendants, and the controversy involves a substantial amount.

The referee did not hold that the language employed in the contract, in the absence of evidence as to custom, would entitle the plaintiffs to recover for the entire superficial area of the streets paved, less crosswalks or bridges, but that the evidence adduced as to the meaning of the term "superficial yard" showed that the term referred to the superficial yard measurement as given by the engineer in charge of the work for the city. His finding upon that subject reads as follows :

"*Third.* That the price of the blocks sold by plaintiffs to the defendants in and by the said contract as laid or used in the cities of New York and Brooklyn, was fixed by a rate per superficial yard ; that the meaning of the term 'superficial yard,' on the evidence, is the superficial yard measurement of the pavement laid and measured by the engineer in charge of the work for the city and returned to the city department. That said measurement in Brooklyn included a superficial area of the street paved, less or excluding the crosswalks or bridges and the receiving basins at the street corners, but including all the other superficial area of the street paved.

"In Brooklyn no allowance upon or deduction from such measurement was made for railroad tracks, nor for sewer manholes, when there were such in the street. In New York an allowance upon and deduction from such measurement was made for railroad tracks."

*Jesse Johnson* and *John C. Shaw,* for the appellants.

*George F. Harriman,* for the respondents.

PARKER, J.:

It is conceded that, in the absence of evidence establishing that the term "superficial yard," as used in the contract, has by long-established usage come to mean the measurement of superficial yards as made by the engineer of the city of Brooklyn in charge of the work, there could have been no recovery for the space occupied by railroad tracks and manholes.

Whether the referee was right in deciding that the contract should be read as if it had been written, "For all blocks used by you in the city of Brooklyn, one dollar and sixty-five cents. per superficial yard, to be determined by the measurements made by the engineer of the city of Brooklyn in charge of the work," we shall consider.

It has long been the law of this State that usuage, in relation to matters embraced in a contract, when it is reasonable, uniform, well settled, not in opposition to fixed rules of law, not in contradiction of the express terms of the contract, and so far established and known to the parties that it may be supposed the contract was made in reference thereto, is deemed to form part of it, and may be shown in order to enable the court to declare what the contract expressed to the parties. (*Walls* v. *Bailey*, 49 N. Y. 464; *Newhall* v. *Appleton*, 114 id. 140; *Smith* v. *Clews*, Id. 190.)

In *Walls*' case, in which FOLGER, J., delivered a well-considered opinion, reviewing at length the authorities bearing on the question, a contractor, who had agreed to plaster defendant's building at a certain price per yard, made no deduction in his bill for cornices, baseboards, or openings for doors and windows.

On the trial it was proved that it was the uniform and well-settled custom of plasterers in Buffalo to so measure. It was held that the evidence was proper, and raised a presumption that defendant contracted with reference to that usage.

The judgment was reversed, however, because the defendant was not allowed to testify that he did not have knowledge of the custom claimed, and this was because the plaintiff had established a local usage as distinguished from one that is general.

The distinction pointed out after full discussion, was, that there are usages so general, and so universally received and acted upon, that they have become a part of the common law, and no one can

be heard to profess ignorance of them.  While, on the other hand, there are usages so restricted to locality or trade or business that ignorance of them constitutes a valid reason why a party may not be held to have contracted with reference to them.

It was the local usage in Brooklyn that the plaintiffs attempted to establish.  It is not suggested by the testimony that the usage claimed is general.  Indeed, it affirmatively appears that such custom does not prevail in the city of New York.  These deductions, such as the defendants contend for here, are required.

The defendant Hart testified that down to the time of the making of the contract he never knew or heard of any such custom, usage or practice as that contended for by the plaintiffs.  His testimony brought him within the ruling of *Walls'* case, but as he was a party to the action the referee was not bound by his testimony, although not directly contradicted.

While he made no finding upon the subject, and may have treated this case as one where the general rule as to the effect of usage upon parties applies rather than the restricted rule applicable to a special locality, we must, nevertheless, assume that he has found as a fact that he did know of it.  And so assuming, we pass it without special consideration, because we think the evidence fails to show that the term "superficial yard," as between contractors and producers of granite, has by local usage become so firmly established to mean "superficial yards, as determined by the measurements of the engineer in charge of the city of Brooklyn," as to be engrafted upon all contracts containing it on the assumption that the parties contracted with reference to it.

A brief analysis of the testimony will suffice to justify our conclusion.  The first witness called by the plaintiffs on the question of usage was John Pierce, who testified that he had had considerable experience in selling paving blocks, and that he had never sold them in any other way than on the engineer's measurement.  But there is nothing in his testimony which shows that the words "superficial yard," as used in this contract, had a definite and well-established meaning in the trade, such as is claimed for them by the plaintiffs.  The inference to be drawn from his testimony seems to be otherwise, for he stated that he usually sold the blocks by written contract, and that while he received pay for them on the basis of the engi-

neer's measurement, he further stated : " I can't say whether it was put that way in the contract or not ; I can't say." It seems that in the early days of granite pavement in Brooklyn the Rockport Company, of which Pierce was the president, sold a quantity of granite blocks to a contractor by the name of Dady, and when the time came for settlement Pierce, in behalf of his company, claimed the right to be paid on the basis of the engineer's measurements, while Dady insisted that he was only entitled to receive payment according to the number of yards, to be ascertained by actual measurement. Pierce's company finally settled with Dady, making in the main the deductions insisted upon, after which Pierce stated that in the future his contracts should specify engineer's measurements.

Charles S. Ferguson, the assistant secretary of one of the plaintiffs, did testify that there was a custom among granite block sellers and layers in the cities of Brooklyn and New York in relation to the method of measurement, when blocks are sold by the superficial or square yard, and that such custom is to take the measurements filed by the city engineer. His testimony, therefore, may be said in a general way to fairly meet the situation, although he failed to state a single instance where a written contract, in which the term " superficial yard " was used, was construed by the parties to mean that which he says was the established custom.

William Kelly, one of the defendants not appealing, also testified in a general way that it was the custom to make settlement according to engineers' measurements.

He does not suggest an instance where a written contract providing that payment should be at a certain price per superficial yard was construed by the parties to mean superficial yards as determined by the measurement of the city engineer. Indeed, he testifies that prior to the making of the contract in question he had had but one contract where railroad tracks ran along the length of the pavement, and that was on Front street in Brooklyn. With reference to that contract he testifies : " It was agreed that they were to be paid by engineers' estimates. I made an agreement and signed it, to pay Booth Brothers that way, and I paid them by engineers' measurements." Had a similar agreement been made here, there could have been no such question as is now presented. While his testi-

mony shows what he did under this particular contract, it does not show, or even tend to establish, that the term " superficial yard " has that well-understood and settled local meaning for which plaintiffs contend.

The defendant John C. Smith also testified that he made payments to the plaintiffs, under this contract, according to the engineer's measurements, but he admits that he purchased of the plaintiffs all of the blocks which he used during the six years last past in Brooklyn by the thousand.

His personal experience touching the established local meaning of the term " superficial yard " is confined to this contract, and,. therefore, does not tend to establish that it had a meaning other and different from that given to it by the dictionary prior to the making of this contract. No other witnesses were called by the plaintiffs. upon this branch of the case.

Their testimony does not justify a finding that at the time of the making of the contract the local usage of the term " superficial yard " was firmly established in the granite trade to mean something different from that which the term ordinarily imports.

When, however, this testimony comes to be considered in connection with the evidence introduced by the defendants, it will appear that there never was any such established custom. It is testified to, and not disputed, that until 1885 it was the custom to purchase blocks by the thousand. That custom has been continued by many, but some of the contractors have from time to time made contracts for blocks to be paid for by the yard. Whatever of custom there is, therefore, has grown up during a period of less than six years immediately preceding the making of this contract. One of the witnesses produced by the defendants to prove that there was no such custom, was Van Brunt Bergen, who for many years had the general superintendence and charge on behalf of the city of all the paving done for it. It is fair to assume that his position was. such that any custom between contractors and sellers of granite would be more likely to come to him than to the average business man.

He testified that the fact is that the city, in paying the contractor, measures in the railroad iron. And it is so understood when the contracts are let, and the bids are made accordingly. But he

declared that he had never heard of any custom, or a claim of a custom, that the persons who furnished stone by the yard should have the railroad iron included in their measurements.

He gave an instance where the city had purchased granite blocks of one of these plaintiffs within two years of the time of the making of the contract in controversy.

The stone was purchased by the square yard of pavement on the requisition of the commissioner. One of the plaintiffs talked with the witness about making allowance for the space occupied by the railroad tracks before requisition was made, but the representatives of the city refused to make any such allowance, and the result was a requisition which was an equivalent to the contract in question. It was subsequently carried out, the expression being treated as meaning precisely what would be its ordinary dictionary meaning. This transaction of itself affords the most satisfactory proof that Booth Brothers, who are plaintiffs here, and the superintendent of paving in the city of Brooklyn, did not know of the existence of any such custom as the plaintiffs claim on this trial. One of the earliest departures from the plan of buying blocks by the thousand was through a contract between the Rockport Company, one of these plaintiffs, and Dady and Cox, contractors. This contract was spoken of in considering the testimony of Pierce, the president of the company. We refer to the subject again because of the testimony of Dady and Cox. Cox points out that the real difference between Pierce and his firm was, that they refused to pay for the space taken by the railroad iron, while Pierce demanded payment for railroad iron on engineer's measurements.

But, finally, he says Pierce agreed to accept actual measurement and a settlement was had on that basis. Dady testifies that after the settlement was made, Pierce said that hereafter he would have a provision for engineers' measurements inserted in their contracts. That statement Pierce did not deny, nor did he attempt to make it appear that he ever caused to be executed a contract other than the one in question, in which it was not provided that payments should be made according to the engineer's measurements if the parties had so agreed.

Thomas Monahan, who is largely engaged in paving streets with Belgian block, cobble stone and other material, says that he usually

purchased his blocks by the thousand, but in the year 1889 he did make a purchase of blocks by the yard, but the contract provided that they should be paid for by the engineer's measurements.

John H. O'Rourke had but one contract by which he agreed to pay for blocks by the yard prior to June, 1889; up to that time he bought mostly by the thousand. In answer to an inquiry whether the engineer's measurements are usually specified in contracts or agreements, whether in writing or verbal, he answered : " I can only speak for myself ; when I made a contract with Mr. Pierce (president of one of the plaintiffs) it was always agreed virtually between us that it was engineer's measurement; · * * * that is all the custom there is about it, the agreement that I make; I think that is all."

Edward J. McKeever testified that the firm of which he was a member purchased blocks of one of the plaintiffs by the yard and paid for them by actual measurements. This the plaintiffs felt called upon to answer in rebuttal, and they produced the contract by which the parties agreed that the settlement should be upon the basis of engineer's measurements, but if the engineer's measurements should include space occupied by rails that such space should be deducted and allowed on the final payment. This only emphasizes what was undoubtedly the fact, that in some cases it was agreed in the first instance that the engineer's estimate should be accepted as final without any deduction for rails or manholes, while in others it was agreed that there should be deductions.

We have already referred to the testimony of the defendant Hart to the effect that he never knew or heard of any such custom or usage as that claimed by the plaintiffs and found by the referee ; and he refers specially to a contract made between him and the plaintiff, the New York Granite Company, in which the price was fixed by the company as follows : One dollar and seventy-five cents per square yard on the engineer's measurement " when laid in the street." A reply was prepared by its president (Pierce), and by it Hart was made to say, " I hereby accept your proposition " at so much per square yard " on engineer's measurement when laid in the street."

In this particular case, therefore, it will be observed that he was careful to have engineer's measurements incorporated twice, evi-

dently intending that there should be no room for dispute as to whether iron and manholes should be measured as stone delivered by the company.

The testimony in this voluminous record would permit of a more extended discussion of the evidence bearing on this subject, but our purpose has been, as briefly as possible, to make it clear that there is nothing in this testimony to support plaintiffs' claim that by an established custom the term "superficial yards" has come to mean superficial yards according to the city engineer's measurements. If the evidence may be said firmly to establish anything about the question, it is that sometimes the parties agree to include rails and manholes in the measurements of stone and pay for the space they occupy as such, and in other cases they do not. Whatever they agree to, if the contract is reduced to writing, finds expression in it. The term "superficial yard" is not used in one case to mean the engineer's measurements without deduction for rails and manholes, and in the other that only actual measurement of stone shall be paid for.

According to the testimony of Engineer Dwyer, whether this contract shall be read as its language imports, or as the plaintiffs claim the evidence shows it should be read, involves to one of these appellants something over $10,000, and justifies him in insisting that the plaintiffs shall be compelled to establish it before he shall be deprived of the right apparently secured to him by the provisions of the contract. We agree with him that the testimony contained in this record does not establish the custom which has been claimed to exist.

The judgment should be reversed as to the appellants Hart and Baird, and a new trial granted, with costs to the appellants to abide the event.

VAN BRUNT, P. J., and FOLLETT, J., concurred.

Judgment reversed as to appellants Hart and Baird, and new trial ordered, with costs to appellants to abide event.